J-S30025-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: N.J.C., A MINOR

APPEAL OF: R.C., NATURAL FATHER

:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 802 MDA 2021

Appeal from the Order Entered May 19, 2021
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s):  CP-31-OC-1-2021

BEFORE:   BENDER, P.J.E., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED NOVEMBER 29, 2021**

R.C. (Father) appeals from the order entered on May 19, 2021, in the Huntingdon County Court of Common Pleas involuntarily terminating his parental rights to his son, N.J.C. (Child), born in August of 2014.  Father now argues there was insufficient evidence to establish termination under 23 Pa.C.S. § 2511(a)(8) and (b).  After careful review, we affirm.

Child's mother died when he was approximately one and one-half years old.  **See** N.T., 3/5/21, at 32.  Father indicated that in 2018, when his son was attending pre-school, "he became concerned about [Child]'s extremely aggressive behaviors[,]" and so he and his paramour "embarked on a course

_____

[*] Retired Senior Judge assigned to the Superior Court.

of conduct to find out what was going on with" Child. Orphans' Ct. Op., 8/18/21, at 1.

Huntingdon County Children and Youth Services (CYS) first became involved with this family on May 29, 2019, when it received a report that Father gave Child, who was four years old at the time, more than his prescribed dose of Clonidine, which, as best we can discern, was necessary to help Child sleep. **See** Orphans' Ct. Op. at 3. According to the report, Father had admitted Child to Southwood Psychiatric Hospital on May 8, 2019, based on his belief that Child suffered from mental illness and displayed severe physical aggression. **See id.** at 1-2. After one week, Child was released from Southwood with prescriptions for Clonidine, Melatonin, and Prozac. **See id.**, at 2.

On May 16, 2019, after Child's discharge from Southwood, CenClear Services, a program designed for children who are at risk of out-of-home placement, began providing services to Child. **See** Orphans' Ct. Op. at 2. CenClear provided mental health therapy, case management, medication management and collaboration with other providers for Child until December 19, 2019. **See id.**

Sara Stazewski, an employee of CenClear, testified that she had concerns because Father admitted to giving Child more Clonidine than Child was prescribed, and she observed a handprint on Child's face that was caused by Father striking Child. **See** Orphans' Ct. Op. at 2-3. Father's paramour

informed Stazewski that Father struck Child across his face because Child vomited in the car and Father believed Child did it purposefully. **See id.** at 3; **see also** N.T., 3/5/21, at 65-67. Further, Stazewski learned that Father was restraining Child in a car seat and locking him in his bedroom. **See** Orphans' Ct. Op. at 3. Stazewski was also concerned that Child weighed only 28 pounds at the age of four. **See id.**

CenClear installed a monitoring system and placed cameras inside Father's home to record incidents of Child's alleged aggression that Father reported. **See** Orphans' Ct. Op. at 3. Stazewski never observed Child acting with aggressive behavior on the recorded footage. **See id.**

In June 2019, CenClear referred Child to Dr. Kristen Hennessy, a licensed psychologist. **See** Orphans' Ct. Op. at 4. Dr. Hennessy had six sessions with Child between June 27 and September 2, 2019. **See id.** Father then removed Child from her care after Child informed Dr. Hennessy that Father had beaten him with a belt, and Dr. Hennessy reported Father for child abuse. **Id.**

The record reveals that CYS opened a case for this family on July 15, 2019. **See** Orphans' Ct. Op. at 3-4. Father was advised that CYS opened a case for continued services for the family and assigned Raystown Developmental Services (RDS) as the service provider. **See id.** Eric Ondrejik, a caseworker for CYS, testified that CYS had concerns regarding Child's aggressive behavior, Child not sleeping nor eating, Child's past traumas,

Father's relationship with Child, unstable housing, Father's parenting skills, and his cooperation with services. *See id.* at 4-5; *see also* N.T., 3/5/21, at 92-93.

On October 8, 2019, the orphans' court removed Child from Father's care. *See* Orphans' Ct. Op. at 5. "The factual bases for placement of [Child] were the behavioral and mental health issues of the child, and the fact that [Father] admitted to striking the child." *Id.* Child was placed in foster care. Child remained in the same foster home through the date of the termination hearing.

On October 18, 2019, the court adjudicated Child dependent. Initially, Child's permanency goal was reunification, and Father's objectives included: attend individual counseling; visitation with Child; anger management; and participate in a parenting program. *See* N.T., 3/5/21, at 95-97. Pursuant to Child's permanency plan, he resumed treatment with Dr. Hennessy on October 29, 2019. *See* Orphans' Ct. Op. at 4.

Dr. Hennessy testified that Father reported Child was "psychotic" and suggested the child was "demonically possessed." Orphans' Ct. Op. at 5. He alleged his son, a 27-pound four-year-old "consistently" attacked the family. *Id.* Father told the doctor that "he had no choice but to restrain [Child] in a car seat for [a] lengthy period of time due to the child's severe aggression." *Id.* Father also reported that Child "did not sleep, eat[,] and was not fully toilet trained." *Id.*

After her initial sessions with Child, Dr. Hennessy expressed concern about how fearful Child appeared to be of Father and that Child exhibited symptoms of Post-Traumatic Stress Disorder (PTSD). *See* N.T., 3/5/21, at 7-8. Dr. Hennessy described that when she first began treatment with Child, if he "made a mistake, he would start to shake. He would anticipate that he would be hit or hurt." *Id.* Dr. Hennessy testified that Child interpreted the Covid-19 pandemic to be something created by Father so that he could not see Child and that Father could hurt Child *via* Covid-19. *See id.* at 12. Additionally, Child informed Dr. Hennessy that Father beat him with a belt. *See* Orphans' Ct. Op. at 6.

In January of 2020, Dr. Hennessy recommended that Child's visits with Father be suspended. *See* Orphans' Ct. Op. at 7. Dr. Hennessy recommended that, for visitation to resume, Father should take responsibility for his role in what happened to Child and apologize for "using inappropriate physical discipline." N.T., 3/5/21, at 15; *see also* Orphans' Ct. Op., at 8. Dr. Hennessy described two unsuccessful attempts by Father to apologize, *via* email, to his son for having hit him in his face. *See id.* Notably, the doctor's "conclusion about the two emails was that they were not significant steps towards [Father] taking responsibility for his actions." *See id.* at 9. At the time of the March 5, 2021, termination hearing, visitation between Father and Child had never resumed. *See* N.T., 3/5/21, at 14.

On January 7, 2021, CYS filed a petition to involuntarily terminate the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(5), (8) and (b). On March 5, 2021, the orphans' court held a hearing. The legal and best interests of Child, then six and one-half years old, were represented by Andrea Lehman, Esquire, as guardian *ad litem* (GAL).[1] CYS presented the testimony of Dr. Hennessy, Ms. Stazewski, Mr. Ondrejik, as well as Piper Tanner and Danielle Morgan, caseworkers at RDS. Father testified on his own behalf; at this time, he was residing in the state of New York. Father also presented the testimony of Heather Fisher, a caseworker at Family Preservation and Reunification.

By order dated May 18, 2021, and entered the following day, the orphans' court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). The court set forth its findings of fact and conclusions of law in an opinion accompanying the order.

On June 14, 2021, Father timely filed a notice of appeal from the order, along with a concise statement of errors complained of on appeal pursuant to

---

[1] The court determined that Child's legal and best interests did not conflict. **See In re K.M.G.**, 240 A.3d 1218, 1238 (Pa. 2020) (affirming **In re K.M.G.**, 219 A.3d 662 (Pa. Super. 2019) (*en banc*); appellate courts should engage in *sua sponte* review to determine if an orphans' court has appointed counsel to represent the child's legal interests in a contested termination proceeding, in compliance with 23 Pa.C.S. § 2313(a), and, where a GAL/counsel was appointed to represent both the child's legal and best interests, whether the orphans' court determined that those interests did not conflict.).

Pa.R.A.P. 1925(a)(2)(i) and (b). On August 18, 2021, in lieu of a Rule 1925(a) opinion, the orphans' court referred this Court to its opinion accompanying the subject order.

On appeal, Father presents the following issue for our review:

> Did the court below abuse its discretion in terminating the parental rights of the Father, given the efforts that the Father made at correcting the circumstances that led to the Child's placement, the relationship between the Father and the Child, and the Father's support system?

Father's Brief at 2.[2]

We note the relevant standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. [A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. ***See*** 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

---

[2] The GAL filed a brief in support of the involuntary termination order. ***See*** Brief for Appellee Andrea L. Lehman, Counsel for Child, 9/8/2021, at 6-20.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need only agree with the court as to any one subsection of 2511(a), in addition to subsection 2511(b), to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the relevant statutory provisions provide as follows:

**(a) General rule.—** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.—** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the

- 8 -

basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

This Court has explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the child welfare agency supplied over a realistic time period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of the agency's services. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Finally, the court must consider whether termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of M.E.P.*, 825 A.2d at1275-76. The "needs and welfare" analysis is relevant to

both Sections 2511(a)(8) and (b). In *In re Adoption of C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), this Court stated:

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 1009 (citations omitted).

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the orphans' court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

In his sole issue on appeal, Father argues that CYS failed to prove by clear and convincing evidence that the conditions which led to Child's removal continue to exist pursuant to Section 2511(a)(8). *See* Father's Brief at 10-12. Father asserts that "contrary to the assertion that [he] would not remedy the conditions requiring placement, [he] demonstrated at length that he

- 10 -

wanted to help" Child, "even at potential risk to himself." *Id.* at 11. Specifically, Father emphasizes that he took Child to multiple service providers to address Child's behavioral and mental health issues. *See id.* Additionally, Father contends that his paramour "assisted him in navigating these providers." *Id.* at 12.

Father also argues that CYS failed to meet its burden of proof with respect to Section 2511(b). *See* Father's Brief at 12-14. Father asserts that the record demonstrates his "dedication to and great love for" Child, and he and Child shared a bond. *Id.* at 13.

In finding that the conditions which led to Child's placement continue to exist under Section 2511(a)(8), the orphans' court credited the testimony of Dr. Hennessy and Mr. Ondrejik, as follows:

> [T]he testimony principally of Dr. Kristen Hennessy, but also Mr. Erik Ondrejik, the CYS caseworker, was unequivocal that the conditions that led to placement continue to exist. Other than attendance at an anger management class[,] the record supports the conclusion that [Father] took no steps to reunify with his son despite the fact that the clinician provided him a roadmap to accomplish reunification. There has been no contact between [F]ather and son since January[] 2020, and [the] reality is that [Child] is today as terrified of his father as he was when he was declared dependent.

Orphans' Ct. Op. at 12-13.

We conclude the record supports the trial court's finding insofar as Mr. Ondrejik testified that Father, although he completed an anger management program, he has not participated in recommended anger management counseling. *See* Orphans' Ct. Op. at 9. Further, Ondrejik testified that Father

did not complete his requisite individual counseling or a parenting program. *See* N.T., 3/5/21, at 96-97, 108, 184, 186.

The orphans' court credited the testimony of Dr. Hennessy who repeatedly expressed significant concerns about Child. *See* Orphans' Ct. Op. at 12. Dr. Hennessy recommended that Child's visits with Father be suspended because Child asked her "to tell the judge to keep daddy away from him. He said make sure the judge knows that daddy kept hitting me and hitting me." N.T., 3/5/21, at 13. At the time of the termination hearing, visitation between Father and Child had never resumed because Father did not address Child's ongoing concerns in the required letters of apology, which included

> being hit multiple times a day, being strapped in car seats for hours at a time, having his dad drag him around in the car seat, hit him in the eye, grab him by the head and twist. All sorts of incidents of abuse that the child describes as ongoing, frequent, repeated.

*Id.* at 24.

Dr. Hennessy indicated that Father denied he abused Child, and testified:

> I said my understanding was that you struck the child in the face while he was vomiting. [Father] said oh that. And I said yes that. And he gave me a series of explanations as to why he had done that. At one point he said why does no one care about what he did to us. I had to explain [Child] is a four-year-old child and the [c]ourt's concern is the safety of a four-year-old child; not what a 27-pound four-year-old is doing to an adult.

*Id.* at 15-16. The foregoing testimonial evidence supports the court's findings that the conditions which led to Child's placement continue to exist.

Indeed, Father failed to attend individual counseling, anger management counseling, and a parenting program. Further, Father has not visited with Child since February 2020 and visits were thereafter suspended. Father's visits never resumed because he never took responsibility for his actions. *See* N.T., 3/5/21, at 14. Therefore, Father's claim regarding Section 2511(a)(8) fails. As such, we discern no abuse of discretion by the court terminating Father's parental rights in this case where Child has been in placement in excess of the twelve-month statutory minimum, the conditions which led to his placement continue to exist, and termination will best serve his needs and welfare.

Turning to Section 2511(b), the court found that "there is no bond between [F]ather and [Child], and, in the opinion of Dr. Hennessy the opportunity to restore a relationship has been lost. She expressed the opinion that this little boy needs the permanency that adoption can provide." Orphans' Ct. Op. at 13.

Contrary to Father's assertion, Dr. Hennessy testified:

> [Child] does not have a healthy bond with his father. He is afraid of his father. And when he has verbalized [a] desire to have contact with [F]ather, it was not for his benefit. It was to make Covid go away so that other people wouldn't have to get hurt.

N.T., 3/5/21, at 27. Dr. Hennessy opined that Child's PTSD symptoms are far less significant than they were when she first met him, but that

- 13 -

[Child] does continue to express and verbalize fear of his father.

So for example, when he has had visitation with members of the family at Raystown Developmental Services, he has verbalized [F]ather will find him and get him. He has been reassured when he is frightened. He wants to know that daddy can't get him and isn't allowed to get him. He also verbalizes that when he thinks about his time with daddy, his belly hurts because he remembers the things that daddy did.

*Id.* at 26. With respect to Father's progress, Dr. Hennessy believed that Father did not make changes that "would allow safe, healthy contact for the child to resume contact; particularly given the child's ongoing fear of the father and [F]ather's ongoing denial of the issue that make the child fearful and increase his clinical symptoms." *Id.* at 52.

Dr. Hennessy concluded that Child has made progress and explained that while in the care of his foster mother, Child's "behavior at home and school is age appropriate. He is a happy kid who likes to learn to read. He likes to show off his counting skills. He likes to show off his new academic achievements. He likes spending time with other kids. He likes to play." N.T., 3/5/21, at 25-26. Dr. Hennessy further noted Child has not exhibited "physical aggression. He sleeps. He eats. He has gained weight. The school reports that he is functioning well[.] *Id.* at 7. Dr. Hennessy opined that the severe issues that were described by Father are not seen in other environments and opined that Child suffers from PTSD. *See id.* at 7-8. With respect to Child's progress, Dr. Hennessy testified that Child "now verbalizes that it was wrong that dad hurt him and that it wasn't his fault that dad hurt

him; that grown[-]ups should make kids listen but they should not hurt them."
***Id.*** at 10.

The orphans' court also credited Dr. Hennessy's testimony, wherein she averred, "We are looking at a child who needs permanency; a father who has not shown any signs of change; and a child who is terrified of his father but is otherwise thriving." N.T., 3/5/21, at 54. Conversely, Child is "doing very well" in his foster mother's care despite some "moments where he is afraid of his father finding and hurting him." ***Id.*** at 25, 26. As such, we conclude that the foregoing testimony of Dr. Hennessy supports the court's findings. We discern no abuse of discretion by the court in concluding that terminating Father's parental rights serves Child's developmental, physical, and emotional needs and welfare pursuant to 23 Pa.C.S. § 2511(b). Accordingly, we affirm the order pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/29/2021

- 15 -